**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THERESA HARRIS,          ) | |
|         ) | |
|      **Plaintiff,**    ) | |
|         ) | **Case No: 11 C 3039** |
|      **v.**      ) | |
|         ) | **Magistrate Judge Jeffrey Cole** |
| MICHAEL J. ASTRUE,     ) | |
| **Commissioner of Social Security,**   ) | |
|         ) | |
|      **Defendant.**    ) | |
|         ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Theresa Harris, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. § 42 U.S.C. §§ 423(d)(2). Ms. Harris asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Ms. Harris is on her third try for benefits. She applied for DIB in May of 2002, but her application was denied early on and she did not pursue her claim any further. (Administrative Record ("R.") 69, 73, 101). She tried again in May of 2004, and this time she was denied initially, on reconsideration, and in an administrative law judge's decision following two administrative hearings. (R. 81, 88, 555-607, 14-21). The Appeals Council denied Ms. Harris's request for review, and she filed suit in federal district court. Magistrate Judge Susan Cox granted Ms. Harris a remand. She found that

the ALJ had failed to adequately explain the weight he did or did not accord the opinion of Ms. Harris's treating physician. (R. 649-80).

In December of 2010, another ALJ convened another hearing at which Ms. Harris, represented by counsel appeared and testified. There was also testimony from a medical expert, a vocational expert, and Ms. Harris's husband. (R. 746-805). At the hearing, Ms. Harris and counsel affirmed that she was alleging a disability onset date of December 30, 2003. (R. 761). This was the day before her insured status expired. (R. 79). That's significant, because a DIB applicant has the burden of proving she became disabled while she was insured. 42 U.S.C, § 423(a)(1)(A); 423(c)(1); *Allord v. Astrue*, 631 F.3d 411, 413 (7th Cir. 2011). In a decision dated March 3, 2011, the ALJ determined that Ms. Harris was not disabled from her claimed onset date of December 30, 2003, to the expiration of her insured status on December 31, 2003, because she retained the capacity to perform her past relevant work as a data entry clerk. (R. 611-25). This became the final decision of the Commissioner when the Appeals Council denied Ms. Harris's request for review of the decision on April 19, 2011. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Harris has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Harris was born on March 29, 1950, making her fifty-nine years old at the time of the ALJ's decision. (R. 186). She has a fourth-grade education. (R. 195). She

can neither read nor write. (R. 60-61). She was born in the rural south and quit school to work in the fields to support her family. (R. 60). Her work experience as an adult consists of construction and assembly-line jobs which involved lifting up to 50 pounds at a time. (R. 192).

## B.
## Medical Evidence

Ms. Harris has to concede that there is a dearth of medical evidence from the year or so leading up to her alleged onset of disability and expiration of her insured status. She was in a car accident in 1994, injuring her thoracic spine. She points to a scant few pages of medical evidence after that that she feels are relevant. (*Plaintiff's Brief*, at 10). In October 1997, a cardiac flow doppler study was normal aside from a trace of mitral regurgitation. (R. 519). In April 1998, an MRI revealed no abnormalities in the lumbar spine other than a slight scoliosis. (R. 544). An MRI of the thoracic spine was completely normal. (R. 545). Ms. Harris had a follow-up regarding her lumbar spine on April 17, 1998, at which time she complained of low back pain. (R. 526). In April, she had upper back pain. (R. 527). Ms. Harris said she was having balance problems in May 1999, and that her back was stiff. (R. 529). On August 11, 2000, she complained of a back flare-up and, again, of problems with her balance. (R. 531). Ms. Harris complained of an ataxic gait in April 2002. (R. 532). She went to physical therapy in April-May 2002, which was helpful, although she continued to complain of back stiffness. (R. 532). Ms. Harris was able to continue working through 2001, and she claims she did not become disabled until December 30, 2003. She did not need to see a doctor from the end of 2002 until February 2004.

Ms. Harris relies principally on records from her treating physician, Dr. Burke. Ms. Harris did not begin seeing Dr. Burke until February 2, 2004, a little over a month after her inured status expired.  (R. 222, 646).  At that time. Ms. Harris said she had no pain but was experiencing back stiffness.  (R. 222).  She told Dr. Burke that she had needed a cane to walk for the previous 7 to 8 years, and that her back impairment dated back to a 1994 car accident.  (R. 222).  Dr. Burke noted decrease range of motion but added that straight leg raising was negative.  (R. 222).

In March, Ms. Harris returned with continued stiffness; she said she couldn't bend over very much.  (R. 221).  Ms. Harris said she last took medication for her condition – mild anti-inflammatories – in 2000.  (R. 221).  Dr. Burke noted her lumbar musculature and range of motion was extremely tense.  (R. 221).

Ms. Harris had an MRI of her lumbar spine done on March 24, 2004.  (R. 160-62).  The study showed disc dessication at L4-S1 and loss of normal disc height.  (R. 160).  There were diffuse bulging discs at L3-4 and L4-5, with bilateral facet hypertrophy and slight narrowing of the central canal.  (R. 160).  Dr. Freeman, a spine specialist (R. 304) to whom Dr. Burke had referred Ms. Harris, reviewed the study and diagnosed "very mild lumbar stenosis."  (R. 307).  When Dr. Freeman examined Ms. Harris in April, he found her to be in mild discomfort.  (R. 306).  She wasn't taking any medications.  (R. 306).  Her gait was normal, and she could heel-toe walk easily.  (R. 306).  Motor function and sensation were normal; reflexes were symmetrical but somewhat depressed.  (R. 306).  Her memory was excellent.  (R. 306).  Dr. Freeman recommended an epidural steroid injection.  (R. 307).

Ms. Harris continued to see Dr. Burke.  In May of 2004, Ms. Harris had been through 8 physical therapy sessions to strengthen her balance and range of motion.  Her lower extremity strength was normal, but she still found it difficulty to walk.  Range of motion was severely restricted.  (R. 299).  In July 2004, Ms. Harris went to the emergency room with complaints of back spasms and right hip pain.  (R. 170).  She was given a prescription for Flexiril, a muscle relaxant, and told to follow up with her physician.  (R. 173).

Ms. Harris returned to her regular visits with Dr. Burke.  She complained of having suffered severe muscle spasms on July 24, 2004.  A few days later, when she saw Dr. Burke, they were mild.  Dr. Burke referred her to a neurologist, recommended a steroid injection, and continued her on Paxil and Xanax.  (R. 219).  In August of 2004, Ms. Harris complained that her legs would feel like they were going to give out.  (R. 298).

Ms. Harris returned to the emergency room in September, complaining of abdominal and back pain.  (R. 180).  It was noted that she was taking Paxil, Xanax, and had had steroid shots.  (R. 178).  Strength and range of motion were normal.  (R. 182).  She received treatment for constipation.  (R. 183-185).

On October 12, 2004, Dr. Burke filled out a form from Ms. Harris's attorney.  (R. 189-196).  She said Ms. Harris suffered from spinal stenosis, her prognosis was poor, she was unable to walk straight, and had trouble walking without assistance.  (R. 189-90).  She had pain in her lumbar spine and left shoulder.  Dr. Burke did not respond to the questions regarding the nature of the pain or how severe it was.  (R. 190).  It was precipitated by movement, and the only reduction in range of motion was Ms. Harris's

inability to walk without assistance.  (R. 190-91).  Ms. Harris had an abnormal gait and muscle spasm.  (R. 191).  Dr. Burke also said Ms. Harris suffered from depression, somatoform disorder, and anxiety.  (R. 191).  These conditions affected her pain.  (R. 192).  Ms. Harris's condition interfered with her concentration often and severely limited her ability to deal with work stress.  (R. 192).  Dr. Burke indicated that Ms. Harris was taking Paxil and Xanax and that these caused dizziness and drowsiness.  (R. 193).  Dr. Burke felt Ms. Harris could walk 3 city blocks without rest and could sit for more than two hours if she had back support she had back support.  (R. 193).  Dr. Burke also circled 45 minutes for that question.  (R. 193).  Dr. Burke had no opinion on how long Ms. Harris could stand; she could apparently do so indefinitely with an assisting device.  (R. 193).  In the next question, Dr. Burke said Ms. Harris could sit or stand/walk for just 2 hours out of a workday.  (R. 193).  She must walk for 15 minutes every 30 minutes.  (R. 193).  Yet, Ms. Harris did not require a job allowing her to shift from sitting, standing, or walking at will.  (R. 194).  She would have to have unscheduled breaks 1-2 times a day.  (R. 194).  Dr. Burke did not know how much Ms. Harris could lift.  (R. 195).  She would miss two days of work each month.  (R. 196).

That same day, Dr. Burke filled out a form for the disability determination service, with some different results.  (R. 186-188).  Her diagnosis was spinal stenosis and "psycho---- dys-----"; this was illegible.  (R. 186).  Dr. Burke said Ms. Harris needed help walking and that she experienced pain but no tenderness, weakness, sensory changes, or reflex changes.  (R. 196).  Cervical range of motion was within normal limits; Dr. Burke had no opinion on lumber range of motion.  (R. 186).  Gait was abnormal.  (R. 186).  Ms. Harris needed a walker to get around; she could not make do

with a cane, quad cane or crutch. (R. 187). Ms. Harris could stand or walk indefinitely if she used an assistive device. (R. 187). She could perform normal lifting and carrying. (R. 187). She had to assume an alternate position for relief as long as was necessary, but Dr. Burke could not say how often. (R. 187).

In June 2005, Dr. Aida Spahic-Mihajkovic completed a form from Ms. Harris's attorney regarding Ms. Harris's mental status. She related a diagnosis of general anxiety disorder and panic disorder. (R. 200). The doctor assigned Ms. Harris a Global Assessment of Functioning score of 60-70, with 70 as the highest in the past year. (R. 200). The denotes a patient who is experiencing some mild symptoms, but generally functioning pretty well. http://www.gafscore.com/. Dr. Mihajkovic reported that Ms. Harris was taking Paxil and Xanax for her condition. (R. 202). She noted Ms. Harris's problems with balance and falling, and felt her psychological state exacerbated those problems. (R. 201-202).

Dr. Mihajkovic felt that Ms. Harris's abilities for unskilled work were unlimited in almost all areas. They were good in the areas of completing an uninterrupted work routine and awareness of normal hazards. They were fair in the areas of remembering procedures, maintaining attendance, performing at a consistent pace, and dealing with stress. There were no areas where Ms. Harris's abilities were poor. (R. 204). In skilled and semiskilled work, She had good ability to understand and remember detailed instructions, carrying out those instructions, and setting goals. They were fair in the area of dealing with stress. (R. 205). Ms. Harris's functional limitations were no more than slight in any area, except for a moderate limitation in activities of daily living. (R. 206). Despite the rather benign assessment of Ms. Harris's functioning and her GAF score, the

doctor somehow determined that she was suffering in a continual state of decompensation. (R. 207).

Ms. Harris suffered a fall at home in July 2005. At the emergency room, she was diagnosed with orthostatic hypotension and placed on Methedrine, an amphetamine. (R. 229-230). She also said the medication was working and she had no side effects. (R. 214). But she fell again in November. This time, she had been moving a large pot in her kitchen. (R. 212). She suffered a lacerated brow, had sutures removed, and suffered no complications. (R. 212).

The record goes on from there, but the evidence becomes more and more remote from the time Ms. Harris must prove she was disabled. By January of 2009, Ms. Harris's back impairment had progressed to the point where an MRI revealed severe disc degeneration with extensive endplate changes. (R. 693). In addition, there was narrowing of the spinal canal at multiple levels and increase in normal lumbar lordosis. (R. 693). In June of 2010, Ms. Harris sought treatment for back pain and spasms from Dr. Roland. His examination revealed a normal gait, not ataxia, and not unsteadiness. (R. 699). Lower extremity strength and range of motion were normal. (R. 699). Paraspinal muscles were tender, and Patricks and Faber tests were positive bilaterally for back pain. Straight leg raising was positive on the left side at 50 degrees. (R. 699). Patellar and Achilles' reflexes were absent. (R. 699). Ms. Harris was given another steroid injection. 9R. 700).

## C.
### The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

Ms. Harris testified that she had a Bachelor's degree and last worked in 2001. (R. 752). After her car accident, she continued to work, but as the years went by, she started having back spasms and was rushed to the hospital a lot. (R. 753-54). When she worked as a substitute teacher, she used a cane to get around. (R. 754). She also used a walker for a little while. (R. 755). She was mostly sitting on the job, but would change positions and stand up if her back hurt. (R. 771). Ms. Harris was taking penicillin and prescription ibuprofen at that time. (R. 773). She also kept falling all the time and developed a fear of falling. (R. 754-55). She was rushed to the hospital may times. (R. 769). Ms. Harris explained that, as it happened, her falling was due to low blood pressure, and she was given medication for it. (R. 755). Finally, her back got so bad that she could no longer work. (R. 754).

Ms. Harris testified that her pain prevented her from "hardly lift[ing] anything"; she would try to wash the dishes but have to stop. (R. 756). Her son mostly did everything around the house. (R. 756). The pain made it difficult for her to concentrate. (R. 758). She said she was on pain medication and received epidural shots for years and completed several rounds of physical therapy, but the relief was temporary. (Id.). She sits on a chair to take a shower. (R. 759).

Ms. Harris also explained that her condition caused her anxiety and she would sometimes "freeze." (R. 761). She began seeing a psychiatrist in 2004 and has taken Paxil and then Xanax for her condition. (R. 761).

**2.**
**The Plaintiff's Husband's Testimony**

Mr. Harris testified that, after the 1994 car accident, his wife's physical condition deteriorated. (R. 798). To help, he would have her grab onto his arm when they walked anywhere and sometimes he grabbed the back of her shirt to keep her from falling. (Id.) He was able to hold her up, but other family members shied away from the task because they were not strong enough to support her when she started to fall. (R. 799). She had been a high energy person, but after the accident he noticed that the dishes and laundry would pile up. (R. 800-801).

**3.**
**The Vocational Expert's Testimony**

The vocational expert ("VE") testified that Ms. Harris's past relevant work included data entry clerk, which was sedentary; mailroom supervisor, which was light; teacher's aide, which was light, and charge attendant, which was medium. (R. 777). The data entry clerk position provided Ms. Harris with a number of transferable skills. (R. 778). The ALJ asked the VE to assume a person had to following residual functional capacity: sedentary work with lifting and carrying ten pounds frequently and occasionally; sitting for six hours; standing and/or walking for two hours; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch and crawl; ambulate with the use of an assistive device; cannot use foot or leg controls; can do occasional overhead reaching, constant fine finger manipulations; should avoid all exposure to unprotected heights, dangerous moving machinery, and vibrations. (R. 778-779). According to the VE, such a person could perform Ms. Harris' previous work as a data entry clerk. (R. 779). Such a person could

also perform the work of a clerk typist, claims clerk, and a photocopy keyboard operator. (R. 782). The VE was unable to provide a satisfactory estimate of the number of jobs available in 2003 because he did not have the appropriate Census data. (R. 781, 783). He guessed that factoring a 25% margin of error would account for the lack of data, and the ALJ said she would send an official interrogatory post hearing. (R. 782-783). But, even then, the VE said he was unable to provide specific information for 2003. (R. 683).

The VE stated none of the positions he listed would allow the employee to alternate sitting and standing every hour for up to five minutes. (R. 783). The ALJ asked the VE to factor in additional limitations as found by Ms. Harris' treating physician, Dr. Burke. (R. 783). The VE stated that absenteeism of two days per month would be unacceptable, as would the use of a walker because the worker would not be able to carry anything. The VE also said she would be perceived by her employer as a hazard to herself and others in the workplace. (R. 784). An employee who fell at work "within one to two times" would also be seen by the employer as hazard to herself or others. (R. 789-790). If the employee's symptoms interfered with her attention and concentration or her ability to deal with work stress to the point where she was off-task any more than five minutes per hour, she could no longer be competitively employed. (R. 784-785).

### D.
### The ALJ's Decision

The ALJ found that Mr. Harris suffered from one severe impairment: degenerative disc disease. (R. 613). The ALJ noted that Ms. Harris received no treatment for her mild mitral valve prolapse and that it had minimal or no effect on her ability to work. (R. 613-14). Similarly, the ALJ found that Ms. Harris' anxiety panic disorder did not cause more than minimal limitation on her ability to work. She never

sought any treatment for the alleged condition before her alleged onset date, despite the fact that she claimed it had a significant affect on her ability to walk. (R. 614). The ALJ noted that Ms. Harris' treating psychiatrist felt she had a GAF of 70 about six months after the expiration of her insured status, which would translate to no more that mild symptoms which would have allowed her to function pretty well. (R. 614). Although the psychiatrist thought Ms. Harris would miss work three times monthly and that her ability to work was seriously limited, she also felt that her ability to function was fair to very good. (R. 615). The ALJ felt the doctor's opinion was inconsistent and she should only accord it "some" weight. (R. 615). She concluded that Ms. Harris had only mild limitations in the areas of daily living, social functioning and concentration, persistence, and pace, and suffered no episodes of decompensation. (R. 616).

The ALJ found that Ms. Harris did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Subpt. P, Appendix 1 (20 CFR 404.1520(d), 404. 1525 and 404.1526)." (R. 616). Specifically, Ms. Harris' degenerative disc disease did not meet the listing for disorders of the spine because there was no evidence of nerve root compression or inability to ambulate effectively. (R. 616).

Next, the ALJ determined that, up to the expiration of her insured status, Ms. Harris:

> had the residual functional capacity to perform less than sedentary work as defined in 20 CFR 404.1567(a). [She] can lift or carry 10 pounds frequently and 10 pounds occasionally. [She] can sit for six hours and stand/walk for two hours. [She] can occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl. [She] can never climb ladders, ropes or scaffolds. [She] is allowed the use of an assistive device to help with ambulation. [She] is limited to no use of foot and leg controls. [She] is limited to occasional overhead reaching. [She] can constantly perform

fine finger manipulation. [She] should avoid all exposure to unprotected
heights, dangerous moving machinery and vibrations.

(R. 617). The ALJ summarized the testimony of Ms. Harris and her husband regarding

her limitations. Mostly, these had to do with her inability to get around, even with a

cane, and her anxiety about losing her balance and falling. (R. 618). The ALJ noted that

Ms. Harris had a history of back problems, but that she did not require any treatment

from 2002 until February of 2004, after her date last insured. (R. 618). At that time, Ms.

Harris was not in any pain, but had noticed an increase in stiffness. (R. 618).

The ALJ acknowledged that an MRI revealed disc dessication, narrowing of the

thecal sac, and bulging disc. (R. 618). The ALJ noted that a spine specialist found Ms.

Harris to have a normal gait and that her MRI depicted very mild lumbar stenosis. (R.

619). Ms. Harris got steroid injections. (R. 619). Later in 2004, she suffered a cut in a

fall and reported back spasms that year and in 2005. (R. 619). The ALJ noted that the

evidence seemed to indicate that Ms. Harris's condition was worsening over time – her

doctor got her a handicapped parking placard in 2010 – but that his evidence came well

after the expiration of her insured status. (R. 620).

The ALJ found that Ms. Harris's complaints were not entirely credible. She did

not take any pain medication on a consistent basis prior to her date last insured. (R. 621).

Her medical treatment prior to that time was sporadic. She rarely complained to her

physician about her back or her balance problems. She did not follow up with treatment

like physical therapy. The medical evidence showed that she did not use an assistive

device all the time. Her pain was occasional and mild. Her treatment for falling – due to

orthostatic hypotension – came after the expiration of her insured status. (R. 621).

The ALJ felt the opinion of Ms. Harris's primary physician was inconsistent   She relied on Ms. Harris's complaints, rather than objective findings, to determine her assessment of her limitations.   She did not begin treating Ms. Harris until after her insured status had expired.   Ms. Harris was diagnosed with very mild lumbar stenosis, which would not support severe restrictions.   The doctor did not prescribed any pain killers.   Still, the ALJ accommodated Ms. Harris's alleged requirement of an assistive device in her residual functional capacity.  (R. 622).

The ALJ went on to rely on the vocational expert's testimony and conclude that, before her insured status expired,  Ms. Harris could perform her past relevant work as a data entry clerk, which Ms. Harris described as being performed mostly sitting and requiring only limited walking.   Also following the vocational expert's testimony, the ALJ made the alternate finding that Ms. Harris could also perform other sedentary jobs such as clerk typist, claims clerk, and photo composition keyboard operator.  (R. 624). Accordingly, the ALJ concluded that Ms. Harris was not disabled "at any time from December 30, 2003, the alleged onset date, through December 31, 2003, the date last insured." (R. 625).

## IV.
## DISCUSSION

### A.
### The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one.   The court must affirm the decision if it is supported by substantial evidence.   42 U.S.C. §§ 405(g).  "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'"   *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir.

2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**B.**
**The Five-Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

### C.
### Analysis

Ms. Harris finds fault with four aspects of the ALJ's decision.  She argues that the ALJ failed to incorporate her findings as to her mental limitations into the ALJ's RFC and hypothetical to the VE.  She contends that the ALJ did not properly consider the opinion of her treating physician.  In addition, Mr. Harris submits that the ALJ "created an evidentiary deficit" when she rejected the only medical opinion as to Ms. Harris's capacity for work in the record.  Finally, Ms. Harris says that the ALJ did not properly assess her credibility because she used "boilerplate language."

Truth be told, Ms. Harris does not have much of a case for disability insurance benefits.  She really boxed herself into a corner by claiming, with her attorney's guidance, an onset date – December 30, 2003 – that was one day before her insured status expired.  That means that she is claiming that she retained the capacity to work up to December 30th, but somehow lost it during the next 48 hours.  That could happen of course.  A claimant could suffer a traumatic injury or have a condition that finally progressed beyond what she could tolerate and still hold down a job.  But nothing like that happened to Ms. Harris.  She had no medical treatment at all in the 12 months preceding her alleged onset and expiration of her insured status or for over a month thereafter.  As already noted, it is Ms. Harris's burden to establish she was disabled before her insured status expired. 42 U.S.C, § 423(a)(1)(A); 423(c)(1); *Allord*, 631 F.3d at 413; *Eichstadt v. Astrue*, 534 F.3d 663, 666 (7th Cir. 2008)("As for the evidence post-dating [claimant's] date last insured, the ALJ reasonably concluded that this, too, failed to support [claimant's] claim. Although this evidence tended to suggest that [claimant] is *currently* disabled, and perhaps was disabled during the late 1990s, it provided no

support for the proposition that she was disabled at any time prior to December 31, 1987.").

But the review of an ALJ's decision is not limited to her conclusion. Unlike appellate review, where the appellate court may affirm a district court's opinion on any reason appearing in the record, *Kuhn v. Goodlow*, 678 F.3d 552, 555 (7th Cir. 2012); *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010); *Brooks v. University of Wisconsin Bd. of Regents*, 406 F.3d 476, 478 (7th Cir. 2005), the district court is constrained to review the ALJ's reasoning to determine if she has adequately traced the path of her reasoning from the evidence to her conclusion.

## 1.

While Ms. Harris has a severe back impairment, she doesn't have much in the way of evidence to show that her back impairment prevented her from working before December 31, 2003. She made matters worse by claiming she did not become unable to work until December 30th. She made them still worse by arguing, in reply to the Commissioner's brief, that the ALJ did not have this two-day window in mind when she denied benefits and made a general RFC finding rather than one linked to the two-day window. Of course, Ms. Harris also accuses the Commissioner of violating the *Chenery* doctrine. (*Plaintiff's Reply*, at 1).

The argument is a popular one for plaintiffs, but it has no place here. Underlying the ALJ's decision was a drumbeat of repeated references to the period during which Ms. Harris had to prove she was disabled. (R. 611, 613, 614, 615, 616, 618, 622). This drumbeat finally culminated in a bold-faced crescendo on the decision's final page: "**The claimant was not under a disability, as defined by the Social Security Act, at any**

**time from December 30, 2003, the alleged onset date, through December 31, 2003,**
**the date last insured . . . ."** (R. 625 (emphasis in original)).

**2.**

The rest of the plaintiff's arguments for remand are a bit better, but none hold up
under scrutiny. Ms. Harris starts with the ALJ's finding as to her mental limitations. In
her decision, the ALJ specifically found that Ms. Harris had mild limitations in her
activities of daily living, social functioning, and concentration, persistence, or pace. (R
615). An claimant who has no more than mild restrictions in these areas has, by
definition, no more than a non-severe impairment. 20 CFR §1520a(d)(1). That means it
does not significantly limit the claimant's ability to do basic work activity. 20 CFR
§404.1521. The Commissioner argues that, because the ALJ concluded Ms. Harris's
restrictions were mild and, thus, that her impairment was not severe, "the ALJ reasonably
refrained from including any mental work limitations in her RFC finding." (*Defendant's*
*Memorandum*, at 5). Ms. Harris argues that the ALJ had to include her finding of mild
limitations in her RFC and in her hypothetical to the VE.

"When determining a claimant's RFC, the ALJ must consider the combination of
all limitations on the ability to work, including those that do not individually rise to the
level of a severe impairment." *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010).
Here, the ALJ didn't ignore the impact of Ms. Harris's anxiety. She discussed her
medications – Paxil and Xanax – and her fear of falling, (R. 617, 619). The ALJ also
noted that Dr. Freeman said she had good cognitive function, excellent memory, and
normal affect. (R. 619). She said that Ms. Harris's mental status was deemed normal
throughout the medical record. (R. 622). And, she pointed out that Ms. Harris did not

receive any treatment for her anxiety prior to the expiration of her insured status. (R. 621). *See Denton*, 596 F.3d at 423 (finding ALJ adequately considered non-severe depression where "the ALJ noted that [claimant] did not seek out treatment for depression during the period of purported disability.").

Moreover, the ALJ did account for Ms. Harris's anxiety in her RFC. Ms. Harris described her anxiety as a fear of falling, which affected her ability to get around without a cane. So, for example, she didn't go out much because she was unsure of her balance; hence, the mild limitation in social functioning. The ALJ stated that although there was only one recorded instance of Ms. Harris being treated for a fall before the expiration of her insured status, she would accommodate Ms. Harris's anxiety over her balance and falling by limiting her to work she could perform while requiring an assistive device to walk. (R. 621-22).

Ms. Harris replies that use of a cane to alleviate the effects of Ms. Harris's anxiety does not account for the ALJ's finding of a mild restriction in persistence, concentration, or pace. She claims that VE testified that even a mild limitation in this area would render an individual unemployable. (*Plaintiff's Reply*, at 5). What the VE *actually* said, however, was that if a person were off task for more than five minutes of every hour of every workday, they would not be retained. (R. 784-85). Accordingly, there would be no work such a person and they would, therefore, be considered disabled. Once again, a *mild* limitation is defined as one that does not significantly a person's ability to do basic work activities. As such, if a person were off task for more than five minutes of every hour of every workday, they would not have a merely mild restriction.

**3.**

20

Next, Ms. Harris contends that the ALJ failed to properly consider Dr. Burke's opinion regarding her capacity to work. The obvious question is, "which one?" In one opinion, Dr. Burke said Ms. Harris could stand or walk indefinitely if she used a walker, could perform normal lifting/carrying of 10 pounds, and had to change positions at unspecified intervals during the day. (R. 186-187). She made no mention of any limitation of motion other than Ms. Harris's need to use an assistive device to walk. (R. 186-187). She had no opinion on the extent of Ms. Harris's pain. (R. 186). In the other opinion, Dr. Burke said that Ms. Harris could walk no more than 3 city blocks with an assistive device. (R. 193). She equivocated on how long Ms. Harris could sit continuously. (R. 193). It might have been 45 minutes; it might have been 2 hours; it might have been 2 hours and 45 minutes. (R. 193). There was no limitation on how long Ms. Harris could stand continuously. (R. 193). Yet, Dr. Burke also thought Ms. Harris could only sit or stand for a total of 2 hours in an 8 hour day. (R. 193). Also, confusingly, Dr. Burke said that Ms. Harris had to get up and walk for 15 minutes every half-hour, but also said that she did not require a job that allowed her to do so. (R. 194). To add more confusion, Dr. Burke rendered all these opinions on the same day.

To be blunt, Dr. Burke's opinions are so inconsistent and contradictory as to make them meaningless. The ALJ decided to assign Dr. Burke's opinion little weight, and rightfully so. An ALJ is free to reject a treating physician's opinion as long as she supplies good reason for doing so. *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011); *Allord v. Astrue,* 631 F.3d 411, 417 (7th Cir. 2011). Here, the ALJ said one reason sge declined to put much stock in Dr. Burke's opinion was because it was inconsistent with the medical record, physical examinations, and diagnostic testing. That's a perfectly

good reason for rejecting a treating physician's opinion. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

The ALJ specifically noted that Dr. Freeman – the spine specialist to whom Dr. Burke referred Ms. Harris (R. 622), *see Scott v. Astrue,* 647 F.3d 734, 740 (7th Cir. 2011)(physician's specialty as a factor in determining weight) – had a different view of Ms. Harris's condition after examining her and looking at her MRI. (R. 622). He said she had a very mild lumbar stenosis and a normal gait. Ms. Harris's treatment did not include pain medication taken regularly; it was limited to occasional physical therapy and a few steroid injections. While steroid injections are a pain treatment, the fact that a patient doesn't need regular pain medication tends to suggest that she suffers occasional flare-ups rather than constant, debilitating pain. Indeed, as the ALJ noted, even Ms. Harris told Dr. Freeman that her pain was only occasional. (R. 621).

The ALJ also noted that Dr. Burke did not treat Ms. Harris until after the expiration of her insured status and that Ms. Harris required no treatment for over a year before that. Contrary to Ms. Harris's contentions (*Plaintiff's Brief*, at 8), there is nothing in Dr.Burke's opinion to suggest she was giving a retrospective assessment of Ms. Harris's capabilities before she began to treat her. (R. 189-196); *cf. Estok v. Apfel*, 152 F.3d 636, 639 (7th Cir. 1998)(doctor specifically termed his opinion as retrospective and referred to medical evidence prior to his treatment). In addition, Dr. Burke saw Ms. Harris on no more than a handful of occasions. Dr. Burke, then, did not have the "longitudinal" picture that usually lends a treating physician's opinion more credence. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)("The treating physician's

opinion is important because that doctor has been able to observe the claimant over an extended period of time . . . .").

The ALJ could have been far harsher in the handling of Dr. Burke's opinion, which was internally inconsistent to an alarming degree. *See Ketelboeter*, 550 F.3d at 625 (ALJ may discount a doctor's opinion when it is internally inconsistent). It is likely, as the ALJ thought, that Dr. Burke was relying too heavily on a relatively new patient's subjective complaints rather than relying on the evidence, which demonstrated mild lumbar stenosis. She was, as the Seventh Circuit has put it, "bend[ing] over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). That is yet another valid reason to discount a treating physician's opinion, but it was only one of several the ALJ cited. She properly assigned little weight to Dr. Burke's opinion and specifically set forth valid reasons for doing so.

## 4.

Ms. Harris contends that because the ALJ rejected Dr. Burke's opinion, she created an evidentiary deficit and relied on only her lay opinion to come up with an RFC for Ms. Harris. Ms. Harris relies on *Suide v. Astrue*, 371 Fed.Appx. 684 (7th Cir. 2010), but that case does not lend support to her position. In *Suide*, the court did not say that once an ALJ rejects a solitary treating physician's medical opinion her RFC must collapse like a house of cards. That's not the law. *See Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)("As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians."). Instead, the court

simply required that the ALJ's RFC be based on substantial evidence.  *Suide*, 371 Fed.Appx. at 690.

While the ALJ in *Suide* failed to offer an adequate discussion of the medical evidence that remained in play once he discounted the treating physician's opinion, the ALJ here engaged in a lengthy discussion of the medical evidence.  Along the way, she specifically said she was giving some weight to the state agency doctors who reviewed the record and said that there was inadequate evidence to establish disability prior to the expiration of Ms. Harris's insured status.  (R. 622).  She noted that, prior to the expiration of Ms. Harris's insured status, diagnostic tests showed slight abnormalities on one occasion and a disc herniation in the thoracic spine on another.  (R. 618).  She also discussed Dr. Freeman's examination report and his assessment of a post-insured status MRI as showing only a mild impairment of the spine.  (R. 621, 622).  It was a thorough and well-reasoned analysis that led to the ALJ's RFC finding which, as the ALJ said, gave Ms. Harris some benefit of the doubt by limiting her to less than a full range of sedentary work and allowing for the use of an assistive device to walk.

### 5.

Ms. Harris also complains that the ALJ failed to properly assess her credibility because she employed "boilerplate language" in her opinion.  The ALJ's opinion does include the kind of stock paragraph that has been decried in a few Seventh Circuit opinions.  *See, e.g., Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012); *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir. 2010).  But it goes beyond those few lines of boilerplate. Just because an ALJ uses a hackneyed phrase or two does not mean a thorough and well-reasoned opinion is scuttled.

*See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2012). If a bit of boilerplate had that virulent of an effect on a document, few plaintiffs' briefs in Social Security disability cases would survive.[1]

An ALJ's credibility determination must be upheld unless it is patently wrong. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). An ALJ's credibility determination is patently wrong when the ALJ's reasons for discrediting testimony are unreasonable or unsupported. *Id.* at 875.

The ALJ recited a number of reasons why she doubted the extent of Ms. Harris's complaints. She didn't take any pain medications on a regular basis. (R. 621). Her medical treatment was sporadic, and there was a long gap including the time she alleges her disability began. (R. 621). She claimed to have long-standing, severe anxiety over falling, but never sought treatment until after her insured status expired. (R. 621). The ALJ felt this evidence demonstrated that Ms. Harris's symptoms were not as bad as she claimed. This was a valid finding. Type of treatment, or lack thereof, are good reasons to doubt a claimant's veracity. *See Schaaf*, 602 F.3d at 876 (". . . the absence of a history of seeking pain treatment despite other doctor visits suggests that Schaaf's current treatment was effective."); *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009)(ALJ was not patently wrong to doubt claimant whose "relatively conservative" course of treatment consisted of prescription pain killers and epidural injections). Moreover, there was

---

[1] The "boilerplate argument" is becoming meaningless boilerplate itself, as disability plaintiff's attorney regularly pepper their briefs with it regardless of whether it is applicable. Counsel are reminded that an attorney violates Rule 11 when he or she presents an argument in a brief that has no reasonable basis in law or fact. Fed.R.Civ.P. 11(b); *Fabriko Acquisition Corp. v. Prokos,* 536 F.3d 605, 610 (7th Cir.2008). When an ALJ provides reasons for disbelieving a claimants testimony, as the ALJ did here, plaintiff's counsel may argue that those reasons are invalid, but a "boilerplate argument" has no basis in fact or law. *See Filus*, 694 F.3d at 868; *Shideler*, 688 F.3d at 311-12.

nothing wrong with the ALJ's focus on the lack of treatment during the thirteen months or so around the two-day period between Ms. Harris's alleged onset date and the expiration of her insured status. The claimant bears the risk of uncertainty from a sparse record due to a lapse in treatment. *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008).

The ALJ also noted that Ms. Harris claimed to have been rushed to the hospital often due to falls, but the medical record prior to the expiration of her insured status does not support this. (R. 621). She did not require an assistive device all the time; medical records noted only when there was a flare-up. (R. 621). Finally, the objective medical evidence close in time to the critical period demonstrated only a mild impairment. (R. 619, 621, 622). "[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010).

An ALJ's credibility determination need not be perfect. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)(upholding ALJ's credibility finding even where two of three of claimant's criticisms were valid). Here, the ALJ's assessment was far better than most and far better than Ms. Harris thinks it was. Ms. Harris is troubled by the ALJ doubting her testimony that she held onto the counter while cooking but fell on one occasion when she was carrying a heavy pot, for pointing out that she didn't go to physical therapy. That's far too little to overturn an otherwise well-reasoned credibility determination. Ms. Harris doesn't even acknowledge the several other reasons the ALJ offered for why her complaints were not completely believable. (*Plaintiff's Brief*, at 16-17).

Essentially, Ms. Harris's arguments are little more than nit-picking. At one point, Ms. Harris complains that the ALJ failed to mention that, at the hearing, she said that if

she sits too long her left side begins to throb. (*Plaintiff's Brief*, at 14). The Commissioner suspects that this testimony referred to Ms. Harris's condition in 2010 which would be irrelevant. From the way the testimony was couched, the Commissioner's suspicion is probably correct. But, in any event, as discussed above, the ALJ provided a laundry list of reasons why Ms. Harris's testimony was not credible. Moreover, the Seventh Circuit has made clear that an ALJ need not specifically assess each individual symptom a claimant comes up with. *McCurrie v. Astrue*, 401 Fed.Appx. 145, 149 (7th Cir. 2010)("The ALJ's decision not to focus on the exact testimony McCurrie prefers does not render his assessment "patently wrong."); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)(ALJ need not specify which statements are not credible). There is no reason to disturb the ALJ's credibility assessment in this case.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#24] is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/29/13